IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Township of Marple, | : | **CASES CONSOLIDATED** |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Pennsylvania Public Utility | : | |
| Commission, | : | |
| Respondent | : No. 1385 C.D. 2024 | |
| | | |
| | | |
| Theodore Uhlman and Julie Baker, | : | |
| Petitioners | : | |
| | : | |
| v. | : | |
| | : | |
| Pennsylvania Public Utility | : | |
| Commission, | : No. 1423 C.D. 2024 | |
| Respondent | : Argued: October 8, 2025 | |

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE LORI A. DUMAS, Judge
                  HONORABLE STACY WALLACE, Judge


OPINION
BY JUDGE WALLACE                                    FILED:  February 2, 2026


The Township of Marple (Township) and intervenors Theodore Uhlman and

Julie Baker (collectively, Intervenors) petition for review of the September 26, 2024

Opinion and Order of the Public Utility Commission (Commission), granting in part and denying in part the Township's exceptions, denying the Intervenors' exceptions, and adopting the Administrative Law Judge's (ALJ) Amended Initial Decision with a modification. The Township and the Intervenors maintain the Commission failed to sufficiently analyze the environmental impacts of a natural gas "reliability station" (Station) PECO Energy Company (PECO) proposed in the Township. After careful review, we affirm.

## BACKGROUND

On February 26, 2021, PECO filed a petition with the Commission requesting a finding "that the proposed situation of the [b]uildings for the . . . Station" would be reasonably necessary for the convenience or welfare of the public. Reproduced Record (R.R.) at 27a. Such a finding would exempt the buildings from Township zoning requirements under Section 619 of the Pennsylvania Municipalities Planning Code (MPC).[1] PECO also requested a finding that the security fence for the Station would be exempt from Township zoning requirements as a public utility "facility." *See Del. Riverkeeper v. Sunoco Pipeline L.P.*, 179 A.3d 670, 695 (Pa. Cmwlth. 2018)

---

[1] Section 619 provides:

> This article shall not apply to any existing or proposed building, or extension thereof, used or to be used by a public utility corporation, if, upon petition of the corporation, the . . . Commission shall, after a public hearing, decide that the present or proposed situation of the building in question is reasonably necessary for the convenience or welfare of the public. It shall be the responsibility of the . . . Commission to ensure that both the corporation and the municipality in which the building or proposed building is located have notice of the hearing and are granted an opportunity to appear, present witnesses, cross-examine witnesses presented by other parties and otherwise exercise the rights of a party to the proceedings.

Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. § 10619.

(en banc) (recognizing Section 619 "does not grant municipalities an implied right to zone with regard to public utility facilities other than described buildings").

PECO explained the proposed Station would include two buildings that would house "[c]ertain facilities, including electronic and telecommunications facilities . . . protect the facilities from the elements, facilitate maintenance, dampen any ambient sound generated by the . . . Station, and create a more aesthetic appearance." R.R. at 17a. PECO averred the purpose of the Station was to ensure adequate natural gas service in the event of extreme weather events and "other parameters," based on the projected increase in demand in Delaware County. *Id.* at 18a-19a. PECO contended that, without the Station, "the natural gas system in Delaware County will become constrained no later than some point within the next 10 years," which would impact reliability, prevent new customers from connecting to the system, and create the risk of price volatility. *Id.* at 20a.

The Township and the Intervenors opposed the petition. The ALJs conducted public input and evidentiary hearings and issued an Initial Decision on December 8, 2021, concluding PECO met its burden of proving that the proposed situation of the Station's buildings was reasonably necessary.[2] The ALJs stressed the limited scope of the proceeding, declining to consider safety or environmental concerns relating to the Station:

> While we find that the concerns . . . are valid, and we are not unsympathetic to those concerns, issues related to noise, gas emissions, aesthetics, traffic and other health and safety concerns are beyond the Commission's review. . . . PECO has sustained its burden of demonstrating that the Station is reasonably necessary to meet the gas supply needs of its customers and that the buildings are required to protect the equipment from the weather, and to keep the equipment

---

[2] ALJ Emily I. DeVoe presided over the public input and evidentiary hearings. ALJ Mary D. Long was subsequently assigned "as an additional presiding ALJ." R.R. at 1954a.

3

secure to ensure that reliable service is maintained and the facilities are maintained in a safe manner. Therefore, its request for the buildings associated with the site to be exempt from local zoning will be granted.

*Id.* at 1970a (footnote omitted).

PECO, the Township, and Theodore Uhlman filed exceptions. On March 10, 2022, the Commission entered an Opinion and Order granting PECO's exceptions, granting in limited part but otherwise denying the Township's exceptions, denying Theodore Uhlman's exceptions, and adopting the ALJs' Initial Decision as modified and clarified. Notably, the Commission clarified that the Station's proposed security fence was exempt from Township zoning requirements as a public utility "facility." R.R. at 2001a-04a. Like the ALJs, the Commission stressed the limited scope of the proceeding:

> In reviewing these Exceptions and the applicable law, we do not find any error in the ALJs' conclusion that issues related to noise, gas emissions, aesthetics, traffic, and other health and safety concerns are beyond the Commission's review in a Section 619 proceeding. The scope of the Commission's review and determination in a Section 619 proceeding is very narrow and, in this case, involves only a determination of whether the proposed site of the buildings associated with the . . . Station is reasonably necessary for the public convenience or welfare of the public. If the Commission finds that the location is reasonably necessary for the convenience or welfare of the public, the buildings are exempt from local zoning ordinances under the MPC. Ancillary issues unrelated to the siting of the buildings, such as the issues related to the siting or route of the public utility's facilities, public safety, or environmental requirements, are outside the scope of a Section 619 proceeding.

> This does not mean that the Commission does not take [the] Township's concerns seriously or that these concerns are not otherwise addressed. While the Commission is not empowered under Section 619 of the MPC to evaluate the various aspects of the environmental impact of a project, it defers to the determinations of those agencies with jurisdiction over such environmental impacts, including the Pennsylvania Department of Environmental Protection (DEP).

4

Moreover, as the ALJs stated, granting PECO an exemption from zoning requirements related to the buildings does not exempt PECO from compliance with the Commission's Regulations or the [Public Utility] Code or regulation by any other agencies responsible for health and safety, such as the Pennsylvania Department of Transportation or DEP. As a certificated natural gas utility within the meaning of the [Public Utility] Code, PECO has the authority to place the buildings along the pipeline to manage the distribution and supply of natural gas in its pipes as long as the [c]ompany operates its facilities in compliance with state and federal regulations. . . .

R.R. at 2021a-23a (citations and footnote omitted).

The Township filed a petition for review in this Court. On March 9, 2023, the Court vacated the Opinion and Order and remanded the matter with instructions that the Commission issue an amended decision, "which must incorporate the results of a constitutionally sound environmental impact review" regarding the situation of the Station's buildings. *Twp. of Marple v. Pa. Pub. Util. Comm'n*, 294 A.3d 965, 975 (Pa. Cmwlth. 2023) (en banc). We agreed with the Commission that the Station's security fence was a public utility "facility" and exempt from the Township's zoning requirements. *Id.* at 972-97. However, we held the Commission erred by concluding it could not consider environmental concerns in deciding whether the situation of the Station's buildings was reasonably necessary. *Id.* at 973. The Court relied on article I, section 27 of the Pennsylvania Constitution, known as the Environmental Rights Amendment (ERA),[3] and held the Opinion and Order was constitutionally deficient:

_____

[3] The ERA provides:

The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, § 27.

5

[I]n proceedings of this nature, the Commission is obligated to consider the environmental impacts of placing [a building] at [a] proposed location, while also deferring to environmental determinations made by other agencies with primary regulatory jurisdiction over such matters. . . . [A] Section 619 proceeding is constitutionally inadequate unless the Commission completes an appropriately thorough environmental review of a building siting proposal and, in addition, factors the results into its ultimate determination regarding the reasonable necessity of the proposed siting. Here, however, the Commission sidestepped this obligation and, though it stated that it would defer to other agencies' determinations regarding environmental issues, failed to identify any such outside agency determinations that pertained to explosion impact radius, noise, or heater emissions. The Commission's "deference" in this context thus appears to have been nothing more than illusory and its environmental review substantively nonexistent. . . .

*Twp. of Marple*, 294 A.3d at 973-75 (citations, emphasis, and some quotation marks omitted) (some alterations in original).

On remand, the ALJ conducted additional evidentiary hearings and issued an Amended Initial Decision, dated April 3, 2024.[4] The ALJ concluded once again that the proposed situation of the Station's buildings was reasonably necessary. R.R. at 4063a-64a. The ALJ first considered the alleged safety risks the Station would pose, explaining she found PECO's evidence more credible and convincing. *Id.* at 4049a. The ALJ reasoned that "[a]ny natural gas infrastructure" posed a risk to people and property, but that evidence indicated "the risk of serious damage to property or injury to people is remote and unlikely to occur." *Id.* The ALJ credited the testimony of PECO's pipeline expert, Mike Israni, and the Township's quantitative risk analysis expert, Jeffrey Marx, that it would be "rare" for a significant incident to occur at a facility like the Station. *Id.* at 4050a-51a. The ALJ placed little weight on testimony

---

[4] ALJ Mary D. Long issued the Amended Initial Decision.

from Township Fire Marshall, James Capuzzi, who expressed concern regarding the potential impact radius (PIR) of an incident at the Station:

> I place more weight on the expert testimony of Mr. Israni. Taking Mr. Israni's testimony and Mr. Marx's testimony together, I conclude that the gas facilities proposed for the Station do not pose an unusual risk to the surrounding people or property. Mr. Capuzzi is not an engineer and does not have any specialized experience with gas safety except in his role as Marple Township Fire Marshall and as a firefighter in Broomall. His reliance on his PIR calculation is misplaced because the pipeline at the [S]tation will be operating at much lower pressure levels than the pressures that he used in his calculation. Further, he conceded that there are existing gas mains under nearby public roadways, Sproul and Cedar Grove Roads. A rupture of these existing pipelines would require a similar evacuation radius as the 330 feet that he calculated for the . . . Station. Therefore, the evacuation radius in the unlikely event of a pipeline rupture at the . . . Station is not different from the evacuation radius that would result from a similarly unlikely pipeline rupture from existing natural gas facilities. In short, Mr. Capuzzi's testimony does not overcome PECO's evidence that the Station is designed and will operate safely and is very unlikely to cause harm to people or property due to gas leaks or explosion that are significantly different from the risks posed by existing facilities.

*Id.* at 4053a (footnote omitted).[5]

Second, the ALJ considered whether the Station would produce unreasonable noise, crediting PECO's contention that it would comply with the Township's noise ordinance, and "that the Station will not produce an unreasonable level of noise that cannot be mitigated with feasible, readily available, and proven technology." R.R. at 4054a. The ALJ explained PECO's engineering firm hired a consultant, Hoover & Keith, Inc., to assist in designing the Station to comply with the noise ordinance.

---

[5] The ALJ also rejected James Capuzzi's concerns regarding "an incident where a PECO electric division employee responded to an incident and would not turn off the PECO gas facility," viewing this as a single incident that was insufficient to establish "PECO will not respond appropriately in the event of a public safety emergency at the . . . Station." R.R. at 4053a.

*Id.* PECO presented testimony from Hoover & Keith, Inc.'s principal consultant and President, Reginald Keith. *Id.* Although the ALJ heard expert testimony in support of the claim that noise from the Station would be harmful, she found this testimony uncompelling:

> In the Remand Proceeding, the Intervenors produced two witnesses who claimed there would be noise impacts from the Station—Dr. James Schmid and Dr. Edward Ketyer. However, neither is an acoustical expert, neither had calculated sound decibel levels for the Station, and neither had reviewed the Hoover & Keith sound study. Dr. Ketyer conceded he was speaking generically about the impact of excessive sound and noise pollution on children's health. He further admitted that he had not taken into account the sound dampening measures recommended in the Hoover & Keith study.
>
> Drs. Schmid and Ketyer's testimony regarding noise at the facility is not sufficient to prove that noise generated by the equipment at the Station will cause an unreasonable impact. PECO's credible evidence shows that the noise can and will be mitigated by sound dampening technology and that PECO can and will comply with [the] Township's Noise Ordinance.

*Id.* at 4054a-55a (footnotes omitted).

Third, turning to concerns regarding air emissions, the ALJ explained the only emissions sources at the Station were the line heater and emergency generator, which would be located outside the Station's buildings. R.R. at 4055a. The ALJ reasoned, therefore, that these emissions sources were public utility "facilities" and not subject to regulation. *Id.* Nonetheless, the ALJ considered the impact the emissions sources would have on air quality "in an abundance of caution." *Id.* The ALJ concluded the emissions sources "will not pose an unreasonable impact on air quality." *Id.*

The ALJ explained the emissions sources do not require permits from the DEP or Environmental Protection Agency (EPA) because of blanket exemptions. R.R. at 4056a. The emergency generator also received a certificate of conformity from the

8

EPA, indicating it complies with that agency's emissions standards. *Id.* at 4056a-57a. Setting permit concerns aside, the ALJ observed the emissions sources would be subject to EPA regulations and DEP enforcement. *Id.* at 4056a. The ALJ credited the testimony of PECO's air quality expert, Jeffrey Harrington, over the opposing expert, Dr. Timothy R. McAuley:

> [The] Township and the Intervenors presented the analysis of Dr. McAuley. According to Dr. McAuley, the Station would create an elevated risk related to increased air emissions from the Station. Dr. McAuley calculated the potential to emit (PTE) of a source of emissions pursuant to the EPA's guidance. According to Dr. McAuley, within a one-mile radius from the Station, the Station would cause or contribute to measurable impacts from emissions of nitrogen dioxide ($NO_2$), carbon monoxide (CO), particulate matter (PM2.5), benzene and formaldehyde, among others. The most significant air quality impacts would occur within a half-mile of the facility.
>
> In response to Dr. McAuley's analysis, PECO also presented evidence in the form of air modeling pursuant to EPA-approved methods. According to Mr. Harrington, Dr. McAuley's air modeling was deeply flawed. Mr. Harrington explained that Dr. McAuley assumed for the purposes of his model that the emergency generator would operate on a 24/7/365 continuous basis, for a total of 8,760 hours per year. This assumption ignores (i) PECO's actual plans (which are to operate the generator only in emergencies and for routine testing for an hour per week), (ii) federal law that restricts such operation to no more than 100 hours per year, and (iii) guidance from the EPA specifying 500 hours as a conservative benchmark for the modeling. In other words, Dr. McAuley modeled air emissions from the generator assuming that PECO would not comply with regulations, which is not a standard principal of air modeling.

*Id.* at 4057a (footnotes omitted).

The ALJ finally considered the Intervenors' claim that PECO failed to prove the Station will not "exacerbate the effects of climate change." R.R. at 4059a. The ALJ described climate change as "a complex problem which requires a balancing of

9

many societal, economic and environmental concerns," observing it was the General Assembly's responsibility to strike the appropriate balance. *Id.* at 4060a. The ALJ explained the General Assembly had delegated the responsibility for developing air quality standards to the DEP and tasked the DEP with developing a climate change action plan and reporting on climate impact. *Id.* Regarding the Intervenors' claim challenging PECO's natural gas demand analysis, the ALJ reasoned:

> [The Intervenors'] only evidence was the speculative testimony of Dr. [Raymond G.] Najjar, [Jr.] that generally, with warming temperatures, natural gas usage will decrease. Dr. Najjar also speculated that PECO customers will convert from using gas appliances to using electric appliances, thereby further decreasing demand. Neither of these opinions was supported by any sort of data typically used by experts, but instead were simply Dr. Najjar's "common sense" opinion. Nor did [the Intervenors] support their argument by pointing to any legislation or other specific factors that might incentivize PECO customers to switch from gas appliances to electric appliances, or any other data which would contradict PECO's demand analysis.

*Id.* at 4062a (footnote omitted).

The Township and the Intervenors filed exceptions, and PECO filed a reply. By Opinion and Order entered September 26, 2024, the Commission granted in part but otherwise denied the Township's exceptions, denied the Intervenor's exceptions, and adopted the ALJ's Amended Initial Decision with a modification. Preliminarily, the Commission considered challenges to the ALJ's findings of fact, determining the evidence supported the ALJ's decision. The Commission modified Finding of Fact number 42, which addressed safety risks at the Station, "to clarify that 'rare' events with a potential impact distance of 100 feet or less would extend only a short distance beyond the site boundary." Op. & Order, 9/26/24, at 37. The Commission edited a reference to the 220-foot potential impact distance that might apply in the event of a

10

full pipe rupture, finding that such an "extremely rare" event is not expected to occur at the Station. *Id.* at 35-37.

In addition, the Commission concluded the ALJ properly analyzed the alleged environmental impacts of the Station. The Commission found no merit to the claim that the ALJ should have applied a "NEPA-style review," referring to the National Environmental Policy Act,[6] which the Commission characterized as unnecessary and excessive. Op. & Order, 9/26/24, at 43-46. NEPA's requirements apply to "major federal projects," the Commission reasoned, rather than "a small utility project." *Id.* at 43-44. The Commission described the environmental review process PECO had already undertaken at the Station's proposed location. *Id.* at 44-45.

The Commission also rebuffed the argument that DEP permit exemptions for the Station's line heater and emergency generator were not "determinations by the

---

[6] 42 U.S.C. §§ 4321-4370m-12. As one court has explained:

> NEPA requires federal agencies to comply with certain procedural requirements when undertaking any major action. In particular, NEPA mandates that agencies take a "hard look" at the environmental consequences of their proposed actions. NEPA itself does not mandate particular results, but simply prescribes the necessary process.
>
> For an action that significantly affect[s] the quality of the human environment, an agency must prepare an Environmental Impact Statement ("EIS"), and if the agency is uncertain about the effect a proposed action will have, the agency must prepare an environmental assessment ("EA") to determine whether an EIS is needed. However, [u]nder NEPA, an EIS or EA is not required unless the contemplated action will affect the environment in a significant manner or to a significant extent, with significance defined in terms of both context and intensity. In some cases, an abbreviated EA will suffice. In other cases, an action may be entirely excluded from environmental review. Such an exception is called a "categorical exclusion" or CE.

*NAACP Erie Unit 2262 v. Fed. Highway Admin.*, 648 F. Supp. 3d 576, 583-84 (W.D. Pa. 2022) (citations and some quotation marks omitted) (one alteration in original).

11

appropriate agency." Op. & Order, 9/26/24, at 47-48. The Commission explained the exemptions were based on specifications in a DEP policy document, indicating the "DEP has determined that minor sources such as the line heater and emergency generator are exempt from plan approval permitting." *Id.* at 47 (emphasis omitted). The Commission noted the emergency generator was subject to emissions standards under federal regulations. *Id.*

Regarding climate change, the Commission emphasized the limited scope of this Court's remand order in *Township of Marple*, contending our order directed the Commission to review "the environmental impacts regarding the proposed siting and placement of the two buildings" at the Station, rather than "potential emissions from downstream customers." Op. & Order, 9/26/24, at 57. The Commission explained it could not enact policy or "alter this legislative scheme" without authority from the General Assembly, but "may only consider the environmental impacts of a building at a proposed location within the confines of its authority." *Id.* at 62-63. Moreover, the Commission explained that the ALJ made findings of fact regarding the Station's greenhouse gas emissions, and that the alleged climate change impacts identified in the case were either speculative or were not specific to the Station and involved fossil fuel combustion as a whole. *Id.* at 67-68. In summary, the Commission concluded:

> Based upon the ALJ's identification of the alleged environmental impacts and careful consideration of the environmental, safety, and additional evidence, as discussed, *supra*, we agree that the ALJ's Amended Initial Decision adequately addressed the environmental impacts of the . . . Station, consistent with the Commonwealth Court's directive . . . , and properly concluded that the proposed . . . Station and related buildings will enhance reliability and availability of supply service to PECO's customers, and that the buildings should be exempt from the Township's zoning ordinance because the situation of the buildings is reasonably necessary for the public convenience or welfare. The ALJ accepted and considered evidence, including expert testimony, and made determinations regarding the evidence and

12

environmental findings regarding the . . . Station . . . to conclude that there would be no unreasonable impact posed by the . . . Station. Therefore, we find that the ALJ thoroughly and cautiously examined the record evidence and properly concluded that the proposed buildings do not pose an unusual safety risk, will not produce unreasonable noise levels, do not include any air pollution sources with emissions in excess of EPA and DEP standards, and will not violate any climate change standards under the Commission's jurisdiction.

*Id.* at 62 (citations omitted).

The Township and the Intervenors filed petitions for review in this Court. The Township and the Intervenors raise numerous issues, which generally challenge the sufficiency of the environmental review in this matter. In addition to advocacy from the Township, the Intervenors, PECO, and the Commission, this Court has received and considered amicus curiae briefs from (1) Delaware Riverkeeper Network, Green Amendments for the Generations, Citizens for Pennsylvania's Future, and Clean Air Council, (2) Energy Association of Pennsylvania, and (3) Our Children's Trust and Mountain Watershed Association.[7]

## DISCUSSION

We review the Commission's orders for violations of constitutional rights and other errors of law. *Johnson v. Pa. Pub. Util. Comm'n*, 338 A.3d 203, 207 n.3 (Pa. Cmwlth. 2025), *reargument denied* (June 16, 2025), *appeal granted* (Pa., No. 191 WAL 2025, filed Dec. 31, 2025). Moreover, we review whether substantial evidence supports the Commission's necessary findings of fact. *Id.* This matter involves the correct application of the ERA, a constitutional provision. "For questions of constitutional law . . . our standard of review is *de novo*, and our scope

---

[7] In response to a letter from PECO, this Court ordered the parties to file supplemental memoranda of law addressing the decision of the United States Supreme Court in *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168 (2025). After consideration, we note *Seven County* involved the interpretation of NEPA and does not impact our decision in this case.

of review is plenary." *Hughes v. Pa. Pub. Util. Comm'n*, 322 A.3d 982, 989 n.5 (Pa. Cmwlth. 2024), *reconsideration denied* (Oct. 1, 2024), *appeal denied*, 340 A.3d 267 (Pa. 2025). This means we show no deference to the Commission when reaching a decision, and we review the entire record on appeal. *See Mercury Trucking, Inc. v. Pa. Pub. Util. Comm'n*, 55 A.3d 1056, 1082 (Pa. 2012).

The Pennsylvania Supreme Court has clarified the proper interpretation of the ERA and the rights it confers:

> This constitutional provision grants two separate rights to the people of this Commonwealth. The first right is contained in the first sentence, which is a prohibitory clause declaring the right of citizens to clean air and pure water, and to the preservation of natural, scenic, historic and esthetic values of the environment. This clause places a limitation on the state's power to act contrary to this right, and while the subject of this right may be amenable to regulation, any laws that unreasonably impair the right are unconstitutional.
>
> The second right . . . , set forth in its second sentence, is the common ownership by the people, including future generations, of Pennsylvania's public natural resources. . . .
>
> The third clause . . . establishes a public trust, pursuant to which the natural resources are the corpus of the trust, the Commonwealth is the trustee, and the people are the named beneficiaries. The terms "trust" and "trustee" carry their legal implications under Pennsylvania law at the time the amendment was adopted. . . .

*Pa. Env't Def. Found. v. Commonwealth*, 161 A.3d 911, 931-32 (Pa. 2017) (citations and footnote omitted).

In addition, the Court has summarized the Commonwealth's duties as a trustee under the ERA:

> First, the Commonwealth has a duty to prohibit the degradation, diminution, and depletion of our public natural resources, whether these harms might result from direct state action or from the actions of private parties. Second, the Commonwealth must act affirmatively via

14

legislative action to protect the environment. Although a trustee is empowered to exercise discretion with respect to the proper treatment of the corpus of the trust, that discretion is limited by the purpose of the trust and the trustee's fiduciary duties, and does not equate to mere subjective judgment. The trustee may use the assets of the trust only for purposes authorized by the trust or necessary for the preservation of the trust; other uses are beyond the scope of the discretion conferred, even where the trustee claims to be acting solely to advance other discrete interests of the beneficiaries.

*Pa. Env't Def. Found.*, 161 A.3d at 933 (citations and quotation marks omitted). These duties apply to "all agencies and entities of the Commonwealth government, both statewide and local." *Id.* at 931 n.23.

## The Township's arguments

The Township contends the Commission failed to conduct a "constitutionally sound environmental review" of PECO's Station proposal. Township's Br. at 22. The Township contends the Commission merely applied the now-overruled "*Payne* test"[8] because it "basically stated that the [p]roject adheres to existing statutes and regulations, minimizes environmental harm, and on balance the benefits are greater than the environmental harm." *Id.* at 48. The Township cites evidence purportedly showing that the Station will have an impact on air quality and human health, create

---

[8] In *Payne v. Kassab*, this Court articulated a three-prong test for analyzing questions under the ERA:

(1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?

312 A.2d 86, 94 (Pa. Cmwlth. 1973) (en banc). The Pennsylvania Supreme Court overruled the *Payne* test in *Pennsylvania Environmental Defense Foundation*, 161 A.3d at 930.

excessive noise, and pose a risk of harm if a serious incident occurs. *Id.* at 10-17, 33-36, 43-45.

Further, the Township argues this Court directed the Commission to defer on remand to the "environmental determinations made by other agencies with primary regulatory jurisdiction over such matters." Township's Br. at 30 (emphasis omitted). The Township argues PECO did not obtain or present evidence of another agency's determinations. *Id.* at 31. The Township contrasts an agency determination, which it describes as a "decision by an agency on an issue, case or claim," with the permits or exemptions PECO received for the Station. *Id.* at 31-32 (emphasis omitted). The Township contends permit applications and standards for equipment are insufficient for an environmental review because they do not "consider the site of a station and the community surrounding it." *Id.* at 33 (emphasis omitted).

In place of the analysis the Commission conducted, the Township advocates for a "little NEPA" review. Township's Br. at 36-37. The Township explains some states, not including Pennsylvania, have environmental policy statutes that "require state government agencies to follow specific procedures before they take action on a major project." *Id.* The Township summarizes statutes from other states, asserting the Commission's review here "paled in comparison." *Id.* at 37-40. The Township contends the Commission did not analyze "how an alternative project or alternative location could feasibly attain the basic objectives of the project" and did not consider how the Station impacts the environment and how those impacts could be minimized or avoided. *Id.* at 41.

### Intervenors' arguments

The Intervenors argue the Commission failed to "meaningfully consider" the greenhouse gas impacts of the Station. Intervenors' Br. at 15, 18-38. They contend

16

greenhouse gas emissions contribute to climate change, which in turn causes "broad and systemic harms" to the Commonwealth's public natural resources, such as rising sea levels, flooding, and increased wildfires. *Id.* at 11, 24-25. The Intervenors argue the Commission serves as a trustee of the Commonwealth's public natural resources under the ERA and violated its duties of prudence, loyalty, and impartiality. *Id.* at 27-37.

The Intervenors acknowledge that statutory provisions other than Section 619 of the MPC authorize the DEP to address climate change, but they contend this does not eliminate the Commission's ability to address climate change under Section 619. Intervenors' Br. at 16, 38-50. The Intervenors argue the ERA requires that we read Section 619 broadly to include climate change in an assessment of whether a utility project serves the convenience or welfare of the public. *Id.* at 39-41. They describe this as a limitation on the Commission's statutory power rather than an expansion of its power. *Id.* at 42-44. The Intervenors observe this Court in *Township of Marple* referred specifically to air emissions. *Id.* at 38-40.

Finally, the Intervenors contend the Commission's review should have taken "reasonably foreseeable" greenhouse gas impacts of the Station into consideration, including "emissions from the combustion and leakage of the gas to be conveyed by the Station." Intervenors' Br. at 16, 50-61. The Intervenors assert some natural gas the Station conveys "will likely leak, releasing methane, a highly potent [greenhouse gas], and the rest will serve its intended purpose of combustion, releasing carbon dioxide, another potent [greenhouse gas]." *Id.* at 53-54. Moreover, they contend the Commission should have considered alternatives to PECO's proposal that would have a lower greenhouse gas impact, such as "additional electrification incentives to

17

reduce gas demand and thereby defer or avoid the need to construct the Station." *Id.* at 17, 62-67.

### Sufficiency of the Commission's review

Our decision in *Frederick v. Allegheny Township Zoning Hearing Board*, 196 A.3d 677 (Pa. Cmwlth. 2018) (en banc), is instructive. In *Frederick*, we considered a challenge under the ERA to an ordinance allowing "oil and gas well operations in all zoning districts so long as they satisfy enumerated standards designed to protect the public health, safety and welfare." *Id.* at 679. The challenge related to a "zoning compliance permit" Allegheny Township granted to CNX Gas Company "to develop an unconventional gas well . . . known as the Porter Pad project." *Id.* at 680.

Critically, we observed that the ERA "does not call . . . for the derailment of economic or social development," nor does it "impose express duties on the political branches to enact specific affirmative measures to promote clean air, pure water, and the preservation of the different values of our environment." *Frederick*, 196 A.3d at 694 (quoting *Robinson Twp., Wash. Cnty. v. Commonwealth*, 83 A.3d 901, 951 (Pa. 2013) (plurality)) (emphasis omitted). Rather, we summarized the pertinent analysis as follows:

> [W]hen the government acts, it must reasonably account for the environmental features of the affected locale . . . . Judicial review of the government's action requires an evidentiary hearing to determine, first, whether the values in the first clause of the [ERA] are implicated and, second, whether the governmental action unreasonably impairs those values.

*Id.* at 695 (citation, emphasis, footnote, and quotation marks omitted) (one alteration in original).

This Court explained a municipality may employ zoning to regulate where gas drilling occurs but not how drilling will be performed. *Frederick*, 196 A.3d at 697.

Complaints by the appellants "about the purported harm to the environment from the operations of the Porter Pad project should have been addressed to the state agencies that issued CNX its operating permits." *Id.* Regardless, we concluded the appellants failed to demonstrate that the ordinance "does not reasonably account for the natural, scenic, historic and esthetic values of [Allegheny] Township's environment." *Id.* at 698. The Court cited testimony, which the zoning hearing board credited, "that there is a long history of oil and gas development safely coexisting with agricultural uses in the rural areas of [Allegheny] Township and that unconventional gas development will actually help preserve farming in the R-2 District." *Id.*

We later applied *Frederick* in *In re: Andover Homeowners' Association, Inc.*, 217 A.3d 906 (Pa. Cmwlth. 2019). In that dispute, Thornbury Township granted a grading permit to Sunoco Logistics and Sunoco Pipeline, L.P. (collectively, Sunoco) relating to Sunoco's plan to construct pipelines across the property of a homeowners' association. *Id.* at 911. The homeowners' association challenged the permit, arguing Thornbury Township violated its duties under the ERA because it had not considered "the prior use of the property as an apple orchard, which resulted in the presence of arsenic in the soil." *Id.* at 912. We explained the homeowners' association presented no evidence in support of its assertion. *Id.* at 915. We reasoned there was no dispute "the soil was remediated at the direction of DEP," and testimony "that contaminated soil remained in the easement was not consistent." *Id.*

In addition, based on *Frederick*, we concluded the homeowners' association's claim that Thornbury Township was obliged to "take affirmative steps to protect the public from potential arsenic contamination" was meritless. *Andover Homeowners' Ass'n*, 217 A.3d at 915-16. This Court explained Thornbury Township conditioned its grading permit on Sunoco's compliance with DEP requirements in an erosion and

sediment (E&S) permit. *Id.* at 916. Furthermore, the zoning hearing board credited the testimony of Thornbury Township's engineer that "when reviewing the grading permit, he considered the prior use of the property as an orchard and spoke with the conservation district. . . . DEP had tested the soil at the property and determined that it was safe for residential development." *Id.* We continued:

> In sum, the record establishes that [Thornbury] Township "reasonably account[ed] for the environmental features" of the property and, thus, satisfied its obligations under the [ERA]. *Frederick*, 196 A.3d at 694. The [homeowners' a]ssociation's concerns about the potential for environmental harm caused by Sunoco's construction activities should have been addressed to DEP when it issued Sunoco the E&S permit.

*Id.* at 916 (footnote omitted) (one alteration in original).

In *Township of Marple*, this Court concluded the Commission erred by failing to consider concerns, including "potential explosions, noise, and emissions from the Station's buildings." 294 A.3d at 974. The ALJ heard extensive evidence regarding these concerns on remand and issued her findings of fact. The Commission reviewed the ALJ's findings on exceptions and adopted them with only minimal clarification, concluding the Station would not pose an "unreasonable impact" to the environment, and the situation of the Station's buildings was reasonably necessary for the public convenience or welfare. Op. & Order, 9/26/24, at 62, 69. Our review of the record supports the Commission's necessary findings of fact and its conclusion.

We emphasize the Commission was the ultimate fact finder in this matter and had the discretion to make credibility determinations and resolve any conflicts in the evidence. *Hess v. Pa. Pub. Util. Comm'n*, 107 A.3d 246, 258 n.7 (Pa. Cmwlth. 2014) (en banc). This Court's inquiry is whether the record contains evidence that supports the Commission's Opinion and Order. *Lyft, Inc. v. Pa. Pub. Util. Comm'n*, 145 A.3d

20

1235, 1240 (Pa. Cmwlth. 2016) (en banc). The fact that the record might also contain evidence that supports a different result is irrelevant. *Id.*

In addition, the legal analysis the Commission employed was consistent with cases like *Frederick* and *Andover Homeowners' Association*. These cases establish the ERA requires a government entity to "reasonably account for the environmental features of the affected locale," rather than eliminate environmental harms entirely. *See Frederick*, 196 A.3d at 695 (quoting *Robinson Twp.*, 83 A.3d at 953). The focus of our review is whether the government entity's action implicates the values of the ERA and, if so, whether the action "unreasonably impairs those values." *Id.*[9] These cases also support the proposition that a government entity must act within the limits of its authority and defer, where appropriate, to the environmental determinations of other entities.[10] *See id.* at 697.

---

[9] *See also Andover Homeowners' Ass'n*, 217 A.3d at 916; *Pa. Env't Def. Found. v. Commonwealth*, 285 A.3d 702, 717 (Pa. Cmwlth. 2022); *Protect PT v. Penn Twp. Zoning Hearing Bd.*, 220 A.3d 1174, 1197-98 (Pa. Cmwlth. 2019).

[10] We question the Commission's explanation that permit exemptions for the Station's line heater and emergency generator were DEP "determinations." *See* Op. & Order, 9/26/24, at 47-48. PECO argued below that the line heater and emergency generator were exempt, but the record appears to indicate the DEP has never actually determined that the exemptions apply. *See* R.R. at 3681a-82a. Moreover, the policy document on which the Commission relies states its policies and procedures should not receive the "weight or deference" of an adjudication or regulation. Dep't of Env't Prot., *Air Quality Permit Exemptions*, https://greenport.pa.gov/elibrary//GetFolder?FolderID=4564 (last visited Jan. 30, 2026). The policy document states it merely establishes a framework for the DEP to "exercise its administrative discretion in the future," and the DEP may choose to deviate from its terms. *Id.*

Nonetheless, any error by the Commission was harmless because the record indicates the line heater and emergency generator are outside the Station's buildings and, like the security fence we addressed in *Township of Marple*, 294 A.3d at 972-73, are independent public utility "facilities" beyond the scope of these proceedings. In the alternative, the Commission did not stop its analysis with the permit exemptions and reviewed air modeling evidence, concluding the emissions sources at the Station would not violate federal standards or unreasonably impact air quality. Op. & Order, 9/26/24, at 41-42.

Although the Township requests that this Court adopt a "little NEPA" review, it acknowledges in its brief that NEPA and the environmental policy statutes of other states are legislative enactments. Our General Assembly has not chosen to enact an environmental policy statute, and we may not impose one by judicial fiat. Similarly, this Court recognized in *Township of Marple* that "concerns regarding . . . emissions from the Station's buildings" were within the scope of these proceedings. 294 A.3d at 973. The Intervenors' greenhouse gas concerns with respect to leaks, downstream combustion, and alternatives reflect their opposition to PECO's broader operations and to the natural gas industry as a whole. However, whether the use of natural gas "is wise or whether it is the best means to achieve the desired result are matters left to the legislature, and not the courts." *See Frederick*, 196 A.3d at 701 (quoting *Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 947 (Pa. 2004)).

## CONCLUSION

We understand the concerns the Township and the Intervenors have expressed regarding the Station. It is apparent the Commission also understood those concerns and, after considering extensive evidence, concluded the Station's buildings would not have an unreasonable environmental impact under the ERA, consistent with this Court's case law. Because the record supports the Commission's necessary findings of fact and its conclusion, we affirm the Commission's September 26, 2024 Opinion and Order.

_____
STACY WALLACE, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

22

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Township of Marple,

       Petitioner

   v.

Pennsylvania Public Utility
Commission,

       Respondent

: **CASES CONSOLIDATED**
:
:
:
:
:
:
:
:
:  No. 1385 C.D. 2024


Theodore Uhlman and Julie Baker,

       Petitioners

   v.

Pennsylvania Public Utility
Commission,

       Respondent

:
:
:
:
:
:
:
:  No. 1423 C.D. 2024
:


# **O R D E R**


  **AND NOW**, this 2nd day of February 2026, the September 26, 2024 Opinion and Order of the Public Utility Commission is **AFFIRMED**.


         _____

         STACY WALLACE, Judge